June Term, 1860.

THE TOWN OF MILWAUKEE
v.
THE CITY OF MILWAUKEE.

## THE TOWN OF MILWAUKEE VS. THE CITY OF MILWAUKEE.

| 12 | 93 |
|----|----|
| 76 | 610 |
| 12 | 93 |
| 81 | 438 |
| 12 | 93 |
| 82 | 381 |
| 12 | 93 |
| 87 | 536 |
| 12 | 93 |
| 92 | 612 |
| 12 | 93 |
| 113 | ²246 |
| 12 | 93 |
| 57 LRA | 251 |

The legislature has not the power, either directly or indirectly to divest a municipal corporation of its private property, without the consent of its inhabitants.

The legislature, however, has an undoubted right to change the territorial limits of municipal corporations, and to detach from a town a portion of its territory and annex it to another town; and, in so doing, may provide for an equitable division of the common property.

Where the legislature takes from a town a portion of its territory, which includes land to which it has the exclusive title, and annexes the same to another town or municipality, without providing for the disposal of such land, under such circumstances that the assent of the town to part with its title cannot be presumed, such town still continues to be the owner of such land, notwithstanding such separation.

By an act of the territorial legislature, approved January 3d, 1838, fractional townships 7 and 8, in Milwaukee county, were formed into a town by the name of the town of Milwaukee, and on the 14th of January, 1846, the supervisors of the town acquired, by purchase, a title to the land in controversy, "in trust for the sole use and benefit of said town forever;" the territorial statute, at the time, giving to every such town, as a body corporate, the power to hold real estate for the public uses of its inhabitants, and convey or dispose of the same as might be deemed conducive to their interests, and providing, also, in case of the division of a town, or annexation of a part thereof to another town, for an equitable partition of such real estate, or apportionment of its proceeds, by the supervisors of the respective towns. The provision for the apportionment of property in case of the division of towns, ceased to be in force from and after the 1st day of May, 1849. On the 31st of January, 1838, a portion of town 7 was incorporated as the village of Milwaukee, but the government of the town of Milwaukee continued over both fractional towns, until January 31st, 1846, when the charter of the city of Milwaukee put an end to the government of the town of Milwaukee, in the territory embraced in the city limits, and the land in controversy continued to be within the town of Milwaukee, until February, 1852, when the limits of the city of Milwaukee were enlarged by an act of the legislature, so as to include said land; none of said acts making any provision for the division or apportionment of the common property: *Held*, that the act extending the limits of the city of Milwaukee over the land in question, did not divest the town of its title thereto.

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.

APPEAL from the Circuit Court for *Milwaukee* County.

This was an action to recover possession of forty acres of land, situate within the present limits of the city of Milwaukee. On the trial in the circuit court, judgment of nonsuit was entered against the plaintiff. The facts appear sufficiently in the opinion of the court.

*J. H. Paine & Son*, for appellant:

The territorial statute for the government of towns, in force at the time the plaintiff acquired the land in controversy, is founded on the theory that the mere division of a town and bringing a portion thereof under the jurisdiction of another town, does not divest the former of its title to land lawfully acquired. It is doubtful whether the legislature could legally divest a town of its title, had they attempted directly to do it; much less can a divestiture of title be inferred from a mere division of a town, against the provisions of the statute referred to. The case of *N. Hempstead vs. Hempstead*, 2 Wend., 109, is inapplicable as a rule for this court, because it does not appear that New York had any statutory provisions concerning lands over which a division of towns had brought another jurisdiction.

*Jason Downer*, for respondent:

The land in controversy was evidently paid for by a tax levied and collected from the whole of the old town of Milwaukee. As that part embraced within the present city limits was by far the most valuable, it probably paid 19-20 of the original purchase money of the land. But the principle on which this case was decided below, is, that by the several acts of the legislature dividing the old town of Milwaukee, no provision is made respecting the common property; and when no such provision is made on the division of a town, the new town owns the land within its boundaries, belonging, before the division, to the old corporation, and the old, those within its boundaries. *N. Hempstead vs. Hempstead*, Hopk., 288; same case, 2 Wend., 109; *Denton vs. Jackson*, 2 John. Ch. Rep., 320; *Medford vs. Pratt*, 4 Pick., 222.

The fact that these town or municipal corporations are not authorized by law to hold land outside of their boundaries, is another reason why the nonsuit was rightly granted.

*By the Court,* DIXON, C. J. This is an action of ejectment commenced in the circuit court of Milwaukee county, by the town against the city, to recover possession of forty acres of land, situate within the present limits of the city. The town was organized by act of the legislature of the territory of Wisconsin, approved January 3d, 1838. On the 31st of January, 1846, a portion of the town was set off and incorporated into the city. On the 14th of January, 1846, the supervisors of the town, "in trust for the sole use and benefit of said town forever," acquired, by purchase from James Murray and wife, a title in fee simple to the land in question. The conveyance was executed to the supervisors by name, as such, and their successors in office. On the trial, the conveyance from Murray to the supervisors was produced and proved, and a regular chain of title from the government to Murray traced and established. It was admitted that the defendant, the city, was in possession. At the time the land was thus acquired by the town, it lay within its limits, and so continued until the 20th of February, 1852, when, by an act passed by the legislature of the state of Wisconsin, entitled, "an act to consolidate and amend the act to incorporate the city of Milwaukee, and the several acts amendatory thereof," the limits of the city were extended so as to bring it within them. In the original act of the territorial legislature, incorporating the city, and the subsequent act of the legislature of the state, amending and consolidating the same, and the amendments thereto, no provision whatever was made respecting the partition or division of the common property. No mention whatever was made of it. Because no such provision was made by the legislature, and because towns are not authorized to hold land outside of their boundaries, the counsel for the city moved for a judgment of nonsuit in the action, which was granted. From this judgment the present appeal is taken.

The grounds taken by the counsel for the defendant to sustain in this court the judgment at the circuit, are the same as those there urged upon the motion for a nonsuit. In support of them, he cites the cases of *Denton vs. Jackson,* 2 John. Ch. R., 320; *North Hempstead vs. Hempstead.* Hopk.,

*June Term, 1860.*

THE TOWN OF MILWAUKEE .
v.
THE CITY OF MILWAUKEE.

June 19.

June Term, 288; the same case in the court of errors, 2 Wend., 109, and
1860.       *Medford vs. Pratt*, 4 Pick., 222.    In order to determine
THE TOWN OF whether those cases sustain the action had in this, it will be
MILWAUKEE
v.          necessary briefly to examine them.    But before doing so, it
THE CITY OF
MILWAUKEE.  will be well to notice the provisions of the territorial statutes
in force at the time the town of Milwaukee acquired the land
in question, touching the corporate character of the several
towns then in existence in the territory, and their capacity
and power to acquire, hold and pass the title to real estate.

By section 1 of chapter 2, part 1st, of an act to provide
for the government of the several towns in the territory, and
for the revision of county government, approved February
18, 1841, it was enacted, that every town then established,
or which might thereafter be established by the legislative
assembly of the territory, should be a body corporate, and
have capacity, 1. To sue and be sued in the manner pre-
scribed by law.    2. To hold real estate for the public uses
of the inhabitants, and to convey the same, either by a vote
of the inhabitants or by a deed of their committee or agents.
3. To hold personal estate for the public uses of its inhabi-
tants, and to alienate or dispose of the same, either by vote or
otherwise.    4. To hold real and personal estate, in trust for the
support of schools, and for the promotion of education with-
in the limits of the town.    5. To make such contracts as may
be necessary to the exercise of its corporate or adminis-
trative powers.    6. To make such orders for the disposi-
tion, regulation or use of its corporate property, as may be
deemed conducive to the interests of its inhabitants.

The third section of the same chapter provided, that all
acts or proceedings by or against a town, in its corporate ca-
pacity, should be in the name of such town, but every con-
veyance of lands within the limits of such town, made in
any manner for the use or benefit of its inhabitants, should
have the same effect as if made to the town by name.    These
provisions being in force at the time the conveyance was
made to the supervisors, comment upon them is unnecessary,
for the purpose of showing not only that they were enabled
to receive it, but that immediately upon its execution and
delivery, for the uses therein specified, the title vested abso-

lutely and entirely in the town, and that thereafter it could
sell, dispose of, and convey the same, at its own free will and
pleasure.    From the language of the third section above
quoted, it may reasonably be implied, that it was the inten-
tion of the territorial legislature that the lands which towns
were empowered to acquire, hold, and dispose of, were to be
situated within their corporate limits.    Such intention is
more plainly manifested by the first three sections of the
second part of the same chapter, which immediately succeed
those above referred to.    The first section provided, that
where a town seized of lands should be divided into two or
more towns, the supervisors of the several towns constituted
by such division, should meet as soon as might be, after the
first town meeting subsequently held in such towns, and
when so met, should have power to make such agreement
concerning the disposition to be made of such town lands,
and the apportionment of the proceeds, as they should think
equitable, and to take all measures, and execute all convey-
ances, which might be necessary to carry such agreement
into effect.

The second section provided, that when any such town
should be altered in its limits, by the annexing of a part of
its territory to another town or towns, the supervisors of the
town from which said territory should be taken, and of the
town or towns to which the same should be annexed, should,
as soon as might be after such alteration, meet for the pur-
pose, and possess the same power as provided in the first
section.    By the third section it was enacted, that if no
agreement for the disposition of such lands should be made
within six months after such division or alteration, then the
supervisors of each town, in which any portions of such lands
should lie, should proceed to sell and convey such part of said
lands as should be included within the limits of said town,
as fixed by the division or alteration, and that the proceeds
should be apportioned between the several towns interested
therein, according to the amount of taxable property in the
town so divided or altered, as the same existed immediately
before such division or alteration, to be ascertained by the
last assessment list of such town.    This act was not in force

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.

at the time of the amendment and consolidation of the charter, and the extension of the corporate limits of the city of Milwaukee, by the act of February 20th, 1852. It was repealed and ceased to be in force, from and after the first day of May, 1849, (Revised Statutes, 1849, Chap. 156, Sec. 4), and, consequently, the last three sections above referred to, have no bearing upon the subsequent legislation of the state, or upon this case, only so far as they go to show the intention of the territorial legislature to limit the power of towns in acquiring real estate to such as should be within their boundaries, and so far, furthermore, as they establish an assurance and pledge of public faith on the part of the territorial government, that no future division or dismemberment of any town should operate to destroy or divest the rights and interests of its inhabitants in and to any lands which it had once lawfully acquired. The formation of our state government in no way affected the condition of either the town or city. When it came into existence, upon the foundation laid by the territorial government, it found and recognized them as existing municipal corporations. They are so recognized in the constitution, and have been so treated in all subsequent legislation. The change from territory to state produced no change in them. The corporation of the town of Milwaukee is to-day the same "artificial, invisible, intangible being," that it was when first organized in 1838. Though it may be more limited in its territorial jurisdiction, in the extent and sphere of its operations as a local government it is nevertheless the same. It was the same in 1852, when it is said to have lost the land in dispute, that it was in 1846, when it acquired it. So far as all past acquisitions of property, real or personal, were concerned, it existed the same at both periods, and still continues to do so, with all its faculties to hold, use and dispose of the same, untouched and unimpaired. Under these circumstances, the present case gives rise to very important questions. Has the legislature the power under our constitution, and under the constitution of the United States, by act, without its assent, to divest the town of its property, and vest it in the city, or any other corporation or person? And, if so, is

the act of severing and withdrawing the property from the political or territorial jurisdiction of the town, and annexing it to or placing it within that of the city, an exercise of such power?

It will be seen at once that these are very grave and perplexing questions. In deciding them, we have endeavored to give to them that careful consideration which their weight and importance deserve. Questions of a similar character have involved courts of great ability and learning in much doubt and anxiety. We may, therefore, well hesitate and be not too confident in the correctness of our judgment. Within the range of our reading we know of no adjudged case so like the present that we may rest upon it as a direct authority. We are not, however, without expressions of opinion from various learned courts and judges, which tend directly to sustain the conclusions to which we have arrived, whilst we know of none of a clearly opposite tendency.

The operations of government depend, to a very great extent, for their success and accomplishment, upon the existence and agency of municipal corporations, such as counties, towns, cities and villages. Without the delegation of a portion of its powers to them, its ends and objects could not be attained. The purposes for which they are instituted, namely, the cheap, expeditious, and convenient promotion and preservation of good order and good government, demand that they should at all times be subject to legislative modification and control, in order that they may be varied with the ever varying condition of the country, and circumstances, habits and wants of the people. It is the apparent connection which these questions have with the exercise of this legislative power and discretion, that renders their decision perplexing and difficult. We would not unwisely or unnecessarily embarrass its exercise or impair its usefulness. Nevertheless, if by virtue of the provisions of our own constitution, or of the constitution of the United States, the legislature is prohibited from divesting or attempting to divest, without its assent, a municipal corporation of its rights of property lawfully acquired, it is plainly our duty so to declare. We think, under the circumstances of the present

case, the legislature had no such power. There are those who, independently of constitutional restrictions, and upon general principles, and on the reason and nature of things, hold that legislative bodies have no such authority, and that such a proceeding would not be an act of legislation, but an act of lawless violence. See opinion of Mr. Justice JOHNSON, *Fletcher vs. Peck*, 6 Cranch, 143. The constitutions, state and federal, furnish ample guards against such abuses, without resorting to such general principles.

Within the principles which we have above stated, the power of the legislature to enlarge, restrict, change, modify, control and repeal all merely public corporations, is undoubted. They are established as a part of the police of the state, and to meet the object of their creation, must be subject to such changes as the exigencies of the times require. Hence the power of the legislature to enlarge the limits of the city of Milwaukee so as to embrace within them the land in question, and subject it and those who occupied it, to the jurisdiction and government of the city, cannot be questioned. All persons residing within the limits of such corporations are obliged to be its members, and to submit to the duties imposed by law. All persons holding or owning property within them are, as to it, bound to the same rule of submission.

The difficulty about the question is, to distinguish between the corporation as a civil institution or delegation of merely political power, and as an ideal being endowed with the capacity to acquire and hold property for corporate or other purposes. In its political or governmental capacity, it is liable at any time to be changed, modified or destroyed by the legislature; but in its capacity of owner of property, designed for its own, or the exclusive use and benefit of its inhabitants, its vested rights of property are no more the subject of legislative interference or control, without the consent of the corporators, than those of a merely private corporation or person. Its rights of property, once acquired, though designed and used to aid it in the discharge of its duties as a local government, are entirely distinct and separate from its powers as a political or municipal body. It might sell its

property, or the same might be lost or destroyed, and yet its June Term, 1860. powers of government would remain. In its character of a political power, or local subdivision of government, it is a THE TOWN OF MILWAUKEE v. THE CITY OF MILWAUKEE. public corporation, but in its character of owner of property, it is a private corporation, possessing the same rights, duties and privileges as any other. This distinction is clearly laid down and established in the case of *Bailey and others vs. The Mayor, &c., of the City of New York,* 3 Hill, 531, and authorities there cited. The inviolability by legislative interposition of the rights and franchises of a private corporation, in cases where there is not, by its charter, or the constitution of the state by which it is granted, a reservation of power to repeal or modify, is demonstrated and established in the case of *Dartmouth College vs. Woodward,* 4 Wheat., 518, by a force of reasoning and power of argument, to the strength and clearness of which nothing can possibly be added. It was there held that the charter of such a corporation was a contract, within the meaning of the first subdivision of section 10 of Article I of the Constitution of the United States, which declares that no state shall pass *any law impairing the obligation of contracts.* The same provision occurs in the 12th section of the 1st article of our state constitution. The reasoning of that case extends as well to the power of the legislature to interfere with the franchises as the rights of property of such corporation; but it is only with respect to the latter that it can be considered applicable to the question we are now considering. And there it is clearly so. Every argument used goes with equal force to prove that the legislature has no power to divest a municipal corporation of its property, previously acquired by purchase' or otherwise. This want of power depends, not upon the character of the corporation, but upon the nature of the right. The right to repeal or modify is not a right to interfere with vested rights of property. The former may exist without the latter. If the legislature possessed both, the exercise of one would not depend on the other. How the total repeal of the charter of a municipal corporation, without provision as to the disposition of its property, (a circumstance not likely to occur,) would affect such property, or the rights of its inhabitants, we are

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.

not called upon here to decide. It is sufficient that the corporation of the town of Milwaukee still continues to exist, and so long as it does so, it is impossible to make a distinction between its rights of property and those of a corporation merely private. Both are, and ought, in the nature of the things, to be equally sacred. In *Terrett vs. Taylor*, 9 Cranch, 43, the right of a state government to dispossess a private corporation of its property, was directly passed upon and denied.

In the cases of *Fletcher vs. Peck*, 6 Cranch, 87, and *Pawlet vs. Clark*, 9 id., 292, it was held that grants of lands by states to individuals or corporations, were contracts within the foregoing provision of the constitution, and that the grantees were thereby protected from molestation by subsequent legislation on the part of such states. If the legislature, in the present instance, without the assent of the town, had attempted, by act, directly to transfer the lands in question from it to the city, or to declare the conveyance from Murray to the supervisors void, or to assert that the title of the town was forfeited, and that the same was vested in the state, could any lawyer be found who would hesitate for one moment to give his opinion, that such legislation was void? And could the legislature, by indirect means, accomplish that which it was impossible for it to do by direct? Did it possess this power as an incident to that of enlarging the limits of the city, or diminishing those of the town? We think not. The only grounds upon which such a pretense could be justified, are, that the property of the town is the property of the state, and therefore subject to its disposal, which needs no argument to refute; or that the separation destroyed the *use*, which carried with it the *right*, and that the city could seize and occupy the land as a sort of *waif*, until the true owner could be let in. We cannot admit that the loss of the use carries with it the right. Under certain circumstances, as in the case of land purchased and used as a highway, which is not designed for, or devoted to, the exclusive use of the inhabitants of the town, but is common to all the people of the state, it might. In such case, the exclusive title of the town, if it may be said to have ever had

any, might be considered at an end, for its continuance would be inconsistent with the general supervision which the officers of every town have, by statute, over the high- ways within their limits. But suppose a town house, pre- pared and erected by the inhabitants for the transaction of its public business, and the preservation of its records, should, without provision as to its disposition, be set off into an adjoining town, would the town thereby lose its right of property? Although it would thereby be prevented from using it for the transaction of business, which must be done within its limits, yet might it not sell it, and with the proceeds provide another? It is not, however, every severance of real property from the political jurisdiction of the municipal corporation to which it belongs, that involves a destruction of its use. By the 2d section of the 3d part of the 5th chapter of the act of the territorial legislature, to which we have above referred, it was made the duty of the supervisors of the several towns of the territory, to take charge of, and provide for, the support of the poor within them, agreeably to the provisions of the law. In the discharge of this duty, there can be no doubt that the town could provide itself with houses and lands, suitable for the protection, exercise, and employment of such paupers. And if it should, the separation of such house and lands would not be inconsistent with the continued use by the town. Under such circumstances the use might be less convenient, but it would not be impossible. As the record in the present case does not disclose for what purpose the town owned and occupied the land in question, it is impossible for us to say that its annexation to the city interfered with its use by the town. If the legislature could, by virtue of its power of division or repeal, deprive a town of its property; and if, after having created it and incited it to such acquisitions, by giving it the capacity, it should do so, such proceeding would be, in the highest degree, arbitrary and indefensible. The perfidy of such an act would be acknowledged by all men.

We do not, however, wish to be understood as saying that the legislature may not, upon the repeal of the charter of a municipal corporation, or a division of its territory, provide

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.

for a fair and equitable disposition or division of its public property. It may, undoubtedly, do so. And ordinarily, when such provision is made, the assent of the corporations, or inhabitants, is to be presumed. For, generally, it is not to be supposed that such acts would be passed against their wishes and interests, but that they are enacted at their request, and for their good. But where, as in this case, a small portion only of such corporation, in which it has a valuable real estate interest, is set off and annexed to an adjoining corporation, and where, as here, it early asserts its claim to such real estate, and no provision is made in the law concerning the same, we do not think any such assent or request can be presumed. And particularly do we think this to be so, where, as here, no advantage is gained to the divided corporation from such division. The consideration of an advantage gained, often affords the strongest ground for the presumption of assent. Where, therefore, the legislature takes from a town a portion of its territory, which includes lands to which it has the exclusive title, and annexes the same to another town or municipality, without providing for the disposal of such lands, and under such circumstances that the assent of the town to part with its title cannot be presumed, such town still continues to be the owner of such lands, notwithstanding such separation. The rule of law upon this subject, is well stated by Chief Justice PARSONS, in the case of *The Inhabitants of Windham vs. The Inhabitants of Portland,* 4 Mass., 384. He says: "A town incorporated may acquire property, real or personal; it enjoys corporate rights and privileges, and is subject to obligations and duties. If a part of its territory and inhabitants are separated from it, by annexation to another, or by the erection of a new corporation, the former corporation still retains all its property, powers, rights and privileges, and remains subject to all its obligations and duties, *unless some new provision be made by the act authorizing the separation.* Thus it would continue seized of all its lands, possessed of all its property, entitled to all its rights of action, bound by all its contracts, and subject to all its duties." This doctrine is sustained by the case of *Medford vs. Pratt,* 4 Pick.,

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.

222, cited by the counsel for the defendant. It was there held, that a meeting-house for public worship, built by a town before its division into parishes, becomes, upon such division, the exclusive property of the first parish. It has always been held in that state, that upon the division of towns (which were parochial as well as municipal in their character, each town constituting, originally, a single parish) into two or more parishes, the parochial property, unless special provision was made, went to the first parish, that is, that portion of the town remaining after the erection of the new parish or parishes, as the original, or representative of the original parish. On this subject the court, in their opinion in that case, say: "The justice of this principle cannot be denied; for the remnant were discharged of no part of their duties or burdens, and the seceders always voluntarily withdrew, carrying with them a great part of the taxable property from which those duties and burdens were before discharged." The same principles are recognized in the cases of *Brunswick vs. Dunning*, 7 Mass., 445; and *Hampshire vs. Franklin*, 16 id., 76, and many others in that state.

Upon the want of power in the legislature of a state to deprive a municipal corporation of its right of private property, Mr. Justice STORY, in delivering the opinion of the court in the case of *Terrett vs. Taylor*, *supra*, says: "In respect, also, of *public* corporations which exist only for public purposes, such as counties, towns, cities, &c., the legislature may, under proper limitations, have a right to change, modify, enlarge or restrain them, securing, however, the property for the uses of those for whom, and at whose expense it was originally purchased."

And again, the same learned judge, in delivering his opinion in the case of *Dartmouth College vs. Woodward*, at page 694, says: "It may also be admitted that corporations for mere public government, such as towns, cities and counties, may, in many respects, be subject to legislative control. But it will hardly be contended, that in respect to such corporations, the legislative power is so transcendent, that it may, at its will, take away the private property of such corporation, or change the use of its private funds, acquired under the

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.
public faith. Can the legislature confiscate to its own use the private funds which a municipal corporation holds under its charter, without any default or consent of the corporators? If a municipal corporation be capable of holding devises and legacies to charitable uses, (as many municipal corporations are,) does the legislature, under our forms of limited government, possess the authority to seize upon those funds, and appropriate them to other uses, at its own arbitrary pleasure, against the will of the donors and donees? From the very nature of our government, the public faith is pledged the other way; and that pledge constitutes a valid compact; and that compact is subject only to judicial inquiry, construction and abrogation. This court have already had occasion, in other cases, to express their opinion on this subject; and there is not the slightest inclination to retract it." At page 668 of the same case, he also says: "Public corporations are generally esteemed such as exist for public purposes only, such as towns, cities, parishes and counties, and in many respects they are so, although they involve some private interests; *but strictly speaking, public corporations are such only as are founded by the government for public purposes, where the whole interests belong also to the government.*" The same doctrine is established with reference to municipal corporations, by the supreme court of Massachusetts, in the case of *Hampshire vs. Franklin, supra,* where an act of the legislature of that state, which directed the payment by one county to another of a sum of money supposed to be equitably due, but for the payment of which there existed no legal obligation, was held unconstitutional and void. The court say: "It certainly must be admitted that, by the principles of every free government, and of our own constitution in particular, it is not in the power of the legislature to create a debt from one person to another, or from one corporation to another, without the consent, express or implied, of the party to be charged." See also *City of St. Louis vs. Russell,* 9 Mo., 503.

The most frequent instances of the application of the rule that legislatures cannot interfere with the rights of property of municipal corporations, are to be found in those cases

where such corporations hold property as trustees, and for
purposes other than those which are merely municipal. The
reason of this probably is, that in such cases, without the
consent of all persons interested, legislatures have no power
whatever to interfere, and because in the division or other
change of municipal corporations, they have almost invari-
ably provided for the equitable distribution of their property
which was strictly corporate, thereby saving interested par-
ties from the necessity of calling upon the courts for assist-
ance. If in the present case the land in question had been
acquired and held by the town, under the 4th subdivision of
the section of the territorial statute above quoted, "in trust
for the support of schools, and for the promotion of educa-
tion within the limits of the town," it would have been an
instance of such special trust. The purposes for which it
would then have held the land, would have been distinct
from and independent of the purposes of its creation as a
municipal government. They would have been educational
and not municipal. In such cases, the right of the legisla-
ture to intermeddle by dividing or diverting the fund, with-
out the consent of the inhabitants, has been often denied.
From some decisions it may even be doubted whether the
legislature has, without such consent, the power to repeal or
destroy a municipal corporation as such trustee, and whether
it is not to be treated, *quoad hoc*, as a separate corporation.
Thus, in the case of *Montpelier vs. East Montpelier*, 27 Ver-
mont, 704, by the charter of the original town of Montpelier
there were reserved, among others, three rights of land for
religious and educational purposes, which, "together with
their improvements, rights, rents, profits, dues and interests,"
were to "remain inalienably appropriated to the uses and
purposes for which they were respectively assigned, and to
be under the charge, direction and disposal of the inhabitants
of said township forever." Subsequently the legislature, by
act, abolished the old town, and in its place erected two new
towns, named respectively Montpelier and East Montpelier.
By the act it was provided, that all property owned or pos-
sessed by, or debts or choses in action due to the old town,
should thereafter be owned and enjoyed by, and collected

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.

for the said towns of Montpelier and East Montpelier, in proportion to the grand list of the persons and property within the territorial limits of said towns, for the year when said act was passed. In a suit by Montpelier against East Montpelier, (which latter had obtained the whole of the funds arising from the rents of such lands for the year 1851, and refused to pay over to the former any portion thereof,) to recover its share of such funds in proportion to said grand list, it was held that such trust funds were not within the words of the act, and that neither of said new towns had any legal interest therein. In the opinion, the court refer to and comment upon the case of *Dartmouth College vs. Woodward*, and several others, and say that if the words of the act had extended to these trust funds, it would, without the assent of the inhabitants of the old township, who were to be regarded as the *beneficiaries*, or *cestuis que trust*, have been liable to constitutional objections. If this be so, and such assent could not be obtained, it would seem that the old corporation, for the purpose of such trust, must be still regarded as in existence. For otherwise it is difficult to perceive how the legislature might not defeat the charity, which all agree it cannot do. To the same effect is the case of the *Trustees of the New Gloucester School Fund vs. Bradbury*, 11 Maine, 118, where an act of the legislature of Maine, authorizing the town to choose a new set of trustees, and directing the first trustees to deliver over the property to them, was held unconstitutional. The fund had the effect to reduce the amount to be raised by taxation for the support of schools in the town, whose inhabitants were thus beneficially interested in it, and the case was said to be within the very language of the case of *Dartmouth College vs. Woodward*. An attempt to distinguish between a municipal corporation and a corporation merely private, in respect to such funds, was repudiated.

The court observe that Chief Justice MARSHALL, in delivering the opinion of the court in that case, says: "Strictly speaking, *public* corporations are such only as are founded by the government, for *public* purposes, where the *whole* interests belong to the government;" and that no authority exists in the government to regulate, control, or direct a cor-

June Term,
1860.

THE TOWN OF
MILWAUKEE
v.
THE CITY OF
MILWAUKEE.

poration or its funds, "except where the corporation is in the *strictest sense public;*" that is, where its *whole interests* and *franchises* are the *exclusive property and domain of the government itself.*"

To the same effect, likewise, is the case of *Plymouth vs. Jackson,* 15 Penn. St., 44, where officers elected by the owners of land within the original township of Plymouth, to take charge of funds arising from lands appropriated for the religious, literary and charitable uses of its inhabitants, which officers had by an act of the legislature been declared to be a body corporate by the name of the "Proprietors of Plymouth," were held to be *in esse* as such corporation, notwithstanding a subsequent act of the legislature, dividing the township of Plymouth, and erecting two new townships out of it and some adjoining territory, by the names of *Plymouth* and *Jackson,* and authorizing the inhabitants of *Jackson* to elect officers who were to take charge of a portion of said funds within that township, and to be a corporation by the name of the "Trustees of the township of Jackson." See, also, the cases of *Harrison vs. Bridgeton,* 16 Mass., 16; *Commonwealth vs. Cullen,* 1 Harris, 133; *Brown vs. Hummel,* 6 Barr, 86; and, *Poulteny vs. Wells,* 1 Aik., 180, cited by the court of Vermont.

For the reasons which we have thus imperfectly attempted to give, and upon the authorities we have cited, we answer the first question in the negative, and give it as our opinion that the legislature has not the power, under the provision of our constitution and that of the constitution of the United States to which we have referred, either directly or indirectly to divest a municipal corporation of its private property, without the consent of its inhabitants lawfully obtained. Our answer to this question renders it unnecessary for us to notice the other. We will do so only so far as it is necessary, in the opinion of the court, to acquit the legislature of all intention, by the act extending the limits of the city of Milwaukee, to injure or deprive the town of any of its just rights. It is evident to our minds, from all the circumstances, that at the time of the passage of that act the interests of the town in the land were either unknown, or not thought of, and

June Term,
1860.

The Town of
Milwaukee
v.
The City of
Milwaukee.

that, therefore, its possible effects upon them were not taken into consideration.

Contrary to our intention at the outset, we have examined many authorities and disposed of the case, before noticing those cited and relied upon by the counsel for the city, which we will now proceed to do. And, first, we may notice a view taken by the counsel, upon which hinges, to a great extent, the application which he seeks to make of them to this case. The land in question was purchased on the 14th day of January, 1846. The city was originally chartered on the 31st day of the same month. So that, in reality, the territory constituting the city was, at the time the land was acquired, a part of the town. Upon these facts he says it is to be presumed that the land was paid for with funds raised from the whole taxable property of the town. He furthermore states, that the present limits of the city embrace a much larger portion of the taxable property of the town, as it was before the city was incorporated, than that which was left in the town after such act of incorporation of the city. He, therefore, contends that it was the intention of the legislature, by the separation of 1852, to transfer the property to the city, because the city, having contributed more towards the purchase money, has a better right in equity than the town. In answer to this argument, we may say, that it does not appear from the record that the city paid any portion of the purchase money, nor does the record show what the value of the taxable property of the city, as compared with that of the town, is. We cannot indulge in the presumption that the city paid any portion of the purchase money. The purchase of the land and original incorporation of the city were very nearly contemporaneous acts, and it is quite as natural to suppose that the town paid for the land out of money afterwards raised by the inhabitants, as with funds realized in any other way. But suppose it was paid for in the manner which the counsel invites us to presume, still the inhabitants of the city, by procuring it to be incorporated as such, without any provision as to the land, and by an acquiescence of six years and upwards, must be presumed to have released their interest in it, and to have consented that it re-

main the sole property of the town as it was after such
division. The charter of the city must be presumed to have
been granted at the request of its inhabitants, and the loss
to the town of so much of its taxable property, without a
corresponding diminution of the expenses of its govern-
ment, together with the advantages gained to the inhabitants
of the city by their new form of government, furnishes am-
ple consideration for such release, which, under the circum-
stances, must be presumed. By incorporating the city, with-
out dividing the land, it became the sole property of the
town; and, if such effect was inequitable, it was not in the
power of the legislature, without the consent of the town,
afterwards to remedy the evil. See *Hampshire vs. Franklin*,
16 Mass., 76, where the doctrine of such presumptions, and
the power of the legislature, are fully discussed. With these
remarks, it will be readily perceived that the cases of *Hemp-
stead vs. Hempstead*, bear very remotely upon the question
we are considering, and, with the exception of a single re-
mark, *merely obiter* made by the chancellor in 2 Johnson,
and subsequently repeated in Hopkins and Wendell, their
authority does not at all conflict with the conclusions to
which we have arrived or the cases to which we have refer-
red. It is said that a town cannot "possess any control or
rights in or over lands lying within another town." As ap-
plied to the facts in those cases, or if understood as limited
to the rights of towns to acquire lands outside their bounda-
ries, it is very proper. But, farther than this, we are unwil-
ling to go. There was nothing in the facts of those cases
which called for the remark or the establishment of such a
principle. Each turned upon the doctrine, in favor of which
the courts make many strong arguments, that the act divid-
ing the town of *Hempstead* and creating the town of *North
Hempstead* was passed at the request of the inhabitants, and
that with their assent it operated as a legislative partition of
the common property, which was divided according to the
limits of the towns as they existed after the division. Chan-
cellor KENT, in the case in 2 Johnson, says expressly, that
"the erection of a new town cannot impair the rights of the
old one, and the new town has none but what are given to it

June Term,
1860.

at the time of creating it, or subsequently." That it was a legislative partition with the consent of the inhabitants, is sustained by the language of the act, long acquiescence, and many express acts on the part of the towns themselves. It was upon this ground the cases were decided. In Hopkins, the chancellor says, that "the legislature, acting upon the application of some, and with the acquiescence of all, divided the town," and concludes his opinion in these words: "The general conclusions from all these views, are, that the division of the original town of *Hempstead*, in 1784, was a legislative partition of the lands of the town between the two new towns; that the partition of these lands by the division of the town, must have been within the contemplation and with the assent of those who solicited and those who acquiesced in the division; and that the partition so made was not inequitable or unjust, in the state of things which then existed."

It follows from the views we have taken, that the judgment of the circuit court must be reversed, and a new trial awarded.

PAINE, J., having been of counsel in this case, was absent.

[NOTE BY DIXON, C. J. Since filing the above opinion, I have been referred to the case of the *City of Louisville vs. Pres. and Trustees of University*, 15 B. Monroe, 642, in which many of the questions involved in this case were before the supreme court of Kentucky, and after an elaborate examination, were determined in accordance with the principles here established. The 29th Vermont has also come to hand, in which, on page 12, the case of *Montpelier vs. East Montpelier*, in equity, is reported. A bill was filed, praying the court of chancery to appoint a trustee to take charge of the property, and execute the trust for the benefit of the inhabitants of the territory which comprised the original township. The repeal of the charter of the original town of Montpelier having left the inhabitants without a trustee, the action was sustained, and a new trustee appointed under the direction of the court.]