CATHCART vs. COMSTOCK.

*November 3, 1882 — January 30, 1883.*

*Counties — Towns — Constitutional Law — Taxation.*

1. Ch. 128, Laws of 1874, provided that, as soon as a separate county organization should be perfected, certain designated territory, comprising the entire town of Jenny and portions of several other towns, should be detached from the county of Marathon and should constitute the county of Lincoln; that, for the purpose of organization, the town clerk of the town of Jenny should, not sooner than October 1, 1874, call an election for county officers, and that the officers so elected should enter upon their duties immediately. *Held:*

(1) Upon the organization of the county of Lincoln the whole of its territory became,.for the purposes of town government, one

town; and the town of Jenny was, in effect, enlarged so as to embrace the whole of such territory. Tay. Stats., 364, sec. 83; R. S., sec. 780.

(2) The supervisors of the town of Jenny, elected in April, 1874, while such town was a part of Marathon county, became the board of supervisors of the county of Lincoln when organized in October, 1874. Tay. Stats., 296, sec. 27; R. S., sec. 663.

(3) The county board thus constituted was authorized to levy and apportion taxes upon the assessment made in the spring of 1874, at least upon such property as was situated in the original town of Jenny; and sales of such property for unpaid taxes so levied were properly made by the county treasurer of Lincoln county in May, 1875.

(4) It was proper, in April, 1875, to elect town officers for the town of Jenny as enlarged by virtue of the statute, and the assessment of property for taxation was properly made in that year by such officers; and the apportionment and levy of taxes was properly made by the town supervisors so elected acting as the county board.

2. Sec. 663, R. S., which provides that the county board of supervisors shall consist of the *chairman* of each of the several towns, etc., but that when the county shall consist of one town the *supervisors* of such town shall constitute the county board, is not in violation of sec. 23, art. IV, of the constitution, which declares that "the legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable."

3. An act creating a new county and providing that it shall be attached to another county for judicial purposes is not unconstitutional; and in such case it is unnecessary to provide for the election of a district attorney, sheriff, or clerk of the circuit court in the new county.

4. An act creating a new county need not provide for a county seat, since, under sec. 654, R. S. (sec. 1, ch. 89, Laws of 1872), the county board is authorized to fix the county seat at its first regular meeting.

5. Subd. 9, sec. 31, art. IV, of the constitution was intended to prohibit the enactment of any special or private law for *incorporating* any town or village *by special charter*, or for the amendment of such charter, and has no reference to mere *quasi*-corporations like the towns which exist as political subdivisions in this state.

6. Ch. 241, Laws of 1876, entitled "an act to attach Lincoln county to the eighth congressional district, and to organize and define the boundaries of certain towns therein," after providing for the attachment of the county to said district, further enacted

that the territory of said county (then constituting one town) should be divided into three parts "to constitute and be known as the towns of C., P., and J., respectively," and that after such towns were organized as therein specified they should "possess all the rights and privileges of other towns in the state." *Held:*

(1) Such act is not within the prohibition of subd. 9, sec. 31, art. IV, of the constitution.

(2) Nor does it violate sec. 23, art. IV, of the constitution, above quoted.

(3) Nor is it a private or local law within the meaning of sec. 18, art. IV, of the constitution, which provides that no private or local bill which may be passed by the legislature shall embrace more than one subject.

APPEAL from the Circuit Court for *Lincoln* County.

The case is thus stated by Mr. Justice CASSODAY:

"The plaintiff, being the original owner of the land in question, brings this action to set aside each of several tax deeds thereon, and under which the defendant claims title, and each of which is alleged as a separate cause of action, and which deeds were issued upon the several assessments, levies, and sales for taxes, and recorded, as follows: *First*, a tax deed issued April 28, 1880, on the assessment and levy of 1874, and on the sale by the treasurer of Lincoln county in May, 1875, and recorded in the office of the register of deeds of Lincoln county, April 28, 1880; *second*, a tax deed issued April 28, 1880, on the assessment and levy of 1875, and on the sale by the treasurer of Lincoln county in May, 1876, and recorded in the office of the register of deeds of Lincoln county, April 28, 1880; *third*, a tax deed issued May 26, 1880, on the assessment and levy of 1876, and on the sale by the treasurer of Lincoln county in May, 1877, and recorded in the office of the register of deeds of Lincoln county, May 26, 1880; *fourth*, a tax deed issued June 14, 1881, on the assessment and levy of 1877, and on the sale by the treasurer of Lincoln county in May, 1878, and recorded in the office of the register of deeds of Lincoln county, June 14, 1881.

Cathcart vs. Comstock.

"It further appears from the complaint, as stated in the brief of the plaintiff's counsel, in effect, that the land in question was, at the time of the attempted organization of the county of Lincoln, a part of the territory of the town of Jenny as it existed in Marathon county, and has always remained within the territorial limits of the town of Jenny as it has been known in Lincoln county; that Lincoln county was erected and created by ch. 128, Laws of 1874; that all the territory described in that chapter was, at the time of its enactment, in Marathon county, and comprised therein the entire town of Jenny, seven and a half government townships of the town of Texas, five government townships of the town of Wein, and a little over thirty-seven government townships of the town of Berlin, all of which towns were duly organized towns in Marathon county; that in the spring of 1874 the proper town officers of those several towns levied the various town and school taxes; that in October, 1874, an election was held in the territory set off by ch. 128, Laws of 1874, pursuant to said chapter, and certain persons were thereat declared elected to the various county offices, and they immediately qualified and entered upon the discharge of their duties; that neither before nor after such attempted organization of Lincoln county in October, 1874, was there any organization or attempt at any organization of any town or towns in Lincoln county, nor any election of town officers in any town or territory in said county, but the town board of supervisors, who were elected in the town of Jenny in April, 1874, while the same was a part of Marathon county, assumed to be and acted as the board of supervisors of Lincoln county after the organization of Lincoln county in October, 1874, and while so acting, and in November, 1874, levied and apportioned the various county and state taxes for that year; that no organization or attempt at any organization, erection, or creation of any town or towns in Lincoln county took place until the passage

Cathcart vs. Comstock.

of ch. 241, Laws of 1876, March 10, 1876; but in April, 1875, the people residing in Lincoln county assumed that the whole territory was one town, and that the town of Jenny was such town, and accordingly they held an election and elected one set of town officers, who acted as the town officers of the entire territory in Lincoln county in levying, assessing, and collecting taxes for 1875, and the town board of supervisors again assumed to be and acted as the county board of supervisors, and as such levied and apportioned the county and state taxes; that, pursuant to said ch. 241, the people in the territory included in the several towns of Corning, Pine River, and Jenny, as defined by that act, met at the time and places therein designated, and held elections for town officers, and the officers so elected levied and assessed the various town and school taxes for 1876, and a county board of supervisors, composed of the chairmen of the several town boards so elected, performed the duties of the county board in levying and apportioning the county and state taxes.

"The above facts were set forth at length and in detail in the complaint, in the form of three several causes of action, founded on said several tax deeds, the third and fourth deeds being both included in the third cause of action. It was further alleged in the complaint that each of said deeds was in the form prescribed by law, and was executed in conformity thereto, and was fair upon its face and a cloud upon the plaintiff's land. To each of these three several causes of action so separately alleged, the defendant demurred generally, and on the ground that the action was not commenced within the time limited by sec. 1210d, R. S. From an order sustaining the demurrer the plaintiff appealed."

*N. H. Clapp*, for the appellant.

*Henry C. Hetzel*, as attorney, and *J. C. Spooner*, of counsel, for the respondent.

There was a brief by *Jackson & Thompson*, as *amici curiæ*.

Cathcart vs. Comstock.

CASSODAY, J.   Ch. 128, Laws of 1874, entitled "An act for the division of the county of Marathon and the erection of the county of Lincoln," provided, in effect, that the territory therein designated should, as soon as a separate county organization was perfected, as provided in said act, be detached from the county of Marathon and be known and called, when so detached and organized, the county of Lincoln, and should thereafter constitute a separate county, except that the same should be and remain attached to the county of Marathon for all judicial purposes (sec. 1); that for the purpose of organization the town clerk of the town of Jenny should, not sooner than October 1, 1874, call an election for a county clerk, treasurer, superintendent, surveyor, and register of deeds for said county of Lincoln, to be held at the place of holding elections in the town of Jenny, giving at least twenty days' notice thereof, in the usual manner, which election was to be governed by the laws applicable to the election of county officers, and all the qualified electors within such detached territory were thereby entitled to vote at such election, and the officers so elected were thereby authorized to enter upon the duties of their respective offices immediately after having qualified, and to hold the same for two years from the first day of January thereafter, and upon the election and qualification of such county officers Lincoln county was thereby declared to be organized and established, and entitled to all the powers and privileges of other counties, under the laws of the state, not organized for judicial purposes, and liable to the same duties and responsibilities, but Marathon county was thereby to remain intact and unchanged in territory, and in all other respects, until Lincoln county should be organized as therein provided (sec. 2); that at the next annual meeting of the board of supervisors of Marathon county they and the board of supervisors of Lincoln county were thereby required to hold a joint session at the county seat of Marathon, and determine

upon and fix the proportion of all county property, moneys, *taxes*, appropriations, debts, and liabilities, a record of which was to be kept by the respective clerks of each county, and the same was thereby made binding upon each of said counties, and such determination was thereby required to be based upon the amount of assessed valuation of property in each of said counties by the last assessment in said territory (sec. 3). The next section (4) provided for an itemized bill of all expenses whatsoever for judicial purposes within the two counties, and an apportionment of the same upon and according to the assessed valuation of the property in the respective counties.

At the time of that enactment, as well as since, the general statutes provided that " the county board of supervisors shall consist of the chairmen of the boards of supervisors of the several towns, etc., . . . but whenever a county shall consist of only one town, the supervisors of such town shall constitute the board of supervisors of such county, and they shall exercise and perform all the power and duties of a board of county supervisors." 1 Tay. Stats., 296, ch. 13, sec. 27; R. S., sec. 663. " Whenever any organized county shall not be divided into towns, such county shall, for the purposes of town government, until so divided, be considered as one town, and may elect town officers, whose powers and duties shall be the same as town officers in other towns, and each county may elect as many justices of the peace as under the county system of government they were authorized to elect." 1 Tay. Stats., 364, ch. 15, sec. 83; R. S., sec. 780.

Such were the statutory provisions under which the levies and sales were made, and the tax deeds issued, which constitute the first and second causes of action herein. Assuming that the legislature had in mind those general provisions of the statutes at the time of the enactment of ch. 128, Laws of 1874, and in view of the provisions of that

Cathcart vs. Comstock.

enactment, it would seem that they thereby intended that upon the election and qualification of the several county officers therein provided for, Lincoln county should be deemed fully organized and established, and entitled to all the powers and privileges of other counties, under the laws of the state, not organized for judicial purposes. This could only be upon the theory that the board of supervisors, elected by the town of Jenny while it was a part of Marathon county, should, upon such organization and establishment of Lincoln county in October, 1874, become by force of the statute the board of supervisors of the county of Lincoln. As stated, the act of 1874 purported to detach the whole of the territory of the town of Jenny, as it existed in Marathon, from that county, and to incorporate the same into Lincoln county. The act also recognized the town organization of the town of Jenny by requiring the town clerk thereof to give the requisite and usual notice for holding an election, for the county officers named, at the place of holding elections in the town of Jenny. This seems to have been essential, since the other territory, detached from Marathon and incorporated into Lincoln, consisted of fractions of towns without any town organization, and hence the town officers in the town of Jenny, at the time of the organization and establishment of Lincoln county, constituted the only existing organization in the territory so detached.

In passing the enactment in question, the theory of the legislature evidently was that the property in the town of Jenny would be assessed in the spring of 1874 by the town officers in that town prior to the establishment of Lincoln county, but that the apportionment and levy of the taxes therein would be by the supervisors elected in the town of Jenny, while acting as the board of supervisors of Lincoln county after its establishment, and that the collection of such taxes, the sale of lands for taxes, and the issuing of tax

deeds thereon, should be by the county officers so to be elected in October, 1874. That such was the legislative intent is further enforced by the enactment of ch. 14, Laws of 1875, for while that provided for the collection of the taxes assessed in 1874 in such fractions of towns so detached, it made no provision for the collection of the taxes assessed in 1874 in the town of Jenny. By such omission it is obvious that the legislature regarded the machinery complete for collecting the taxes assessed in the town of Jenny that year. Such being the legislative intent, evinced by the act of 1874, and the land in question being situated wholly in what was the town of Jenny as it existed in Marathon county, it remains to be determined whether that act gave effect to such intent or was invalid. The decision of this question will determine whether the demurrers to the first and second causes of action alleged were properly sustained.

It is contended by the learned counsel for the plaintiff that there was no legal organization of the county of Lincoln, because there was no town organization in the county. He thinks, however, that the entire town of Jenny, as organized and constituted in Marathon county, became a town in Lincoln county, and needed no further organization, "except, perhaps, a new election of officers." We see no necessity, however, for such special election, and the word "perhaps" indicates that counsel does not regard such "new election" as really essential. Being organized, it remained organized, especially as there is nothing in the act indicating an intent to disorganize, but, on the contrary, an express recognition of its organic existence, as one of its officers was therein designated to put in motion the election for the new county officers. The learned counsel, who appear for the plaintiff, *amici curiæ*, squarely admit its corporate existence in the new county, and cite *People v. Maynard*, 15 Mich., 463, to show that it continued to exist intact when thus set off into the new county. That was an information filed by the

attorney general against the defendant for intruding into and usurping the office of county treasurer of Marquette county. The defendant pleaded, in effect, that the treasurer of Marquette county resided in the territory detached therefrom by the organization of Washington county, and thereby created a vacancy in the office, to fill which he had been appointed by the supervisors of Marquette, and also that an additional act had been passed to organize designated territory into the township of Negaunee, in the county of Washington. The replication alleged that the county of Marquette consisted of but three townships, viz., Marquette, Negaunee, and Chocolay, and that only parts of the former two were embraced in the new county, and that such parts contained 700 electors, and also set forth the portions of the parts of the two townships included in the new township and the number of electors therein, and also the number in the parts not included in the new township; and also set forth the part of Negaunee remaining in Marquette county and left by the new township act without any township organization, and the number of electors therein. To the replications a demurrer was interposed. The acts were declared void because a portion of the territory in the new county was not included in any town, and the electors therein were thereby deprived of the right of suffrage in any town or county government; and that there could be no county with a single town, because there could be no county "board" of supervisors with a single member. Mr. Justice CAMPBELL, giving the opinion of the court, said: "The first statute does not undertake to create or organize townships. If such were already in active existence, of course no such creation was necessary, as the general laws would then furnish the guide for their action in holding elections. . . . The only inquiry must be whether organized towns were already to be found in the new county. If they were, we see no difficulty in the way of the complete

organization through the spring elections. . . . This act, then, provided no means for organizing this detached territory (not included in the new town organized), *and no general law reaches the case,* and consequently no elections could be had in it." *Town of Milwaukee v. City of Milwaukee,* 12 Wis., 98.

In the case before us, however, we think the general statutes do reach the case. They provide that "whenever any organized county shall not be divided into towns, such county shall, *for the purposes of town government,* until so divided, *be considered as one town,* and may elect town officers," etc. Here the new county was not divided into towns, and hence, for the purposes of town government, and until so divided, was to be considered as one town. As to this, we apprehend, there would have been no doubt, if ch. 128, Laws of 1874, had embraced that section; but being in the general statutes, it became applicable to any case coming within its provisions, and hence to this case, the same as though it had been embraced within that act. It in effect, if not in terms, expanded the town of Jenny for the purposes of town government, and until the new county should be divided into towns. It cannot be confined to a case where the detached territory organized into the new county embraces only what was a single organized town in the county from which it was detached, for if that had been the only legislative intent they would have employed different language to express such intent. Nor can it be that they only intended it to be applicable when the detached territory included no organized town, but only fractions of towns, because an "organized county" presupposes the existence of towns, or at least a town; besides, had such been the intent, the absence of any town would in some way have been expressed. The language "whenever any organized county shall not be divided *into towns,*" thus using the plural, seems, therefore, to indicate that such detached terri-

tory may, prior to its detachment, have embraced one organized town and fractions of other towns, or, perhaps, territory never embraced in any town. Here the detached territory embraced what had been in Marathon county one entire organized town and fractions of three other towns, and we are of the opinion that, upon the organization of Lincoln county by the election of officers in October, 1874, the whole of such detached territory, under the statutes, at once became, and, for the purposes of town government, must be deemed and considered, as one town, and was so to remain until legally divided.

Such being the construction given to sec. 83, ch. 15, 1 Tay. Stats., 364 (sec. 780, R. S.), it follows that the language above quoted from sec. 27, ch. 13, 1 Tay. Stats., 296 (sec. 663, R. S.), is directly applicable; for, so construed, here was a county consisting of one town, and hence, by this last section, the supervisors thereof, immediately upon the organization of Lincoln county, constituted the board of supervisors of that county, and could thereupon exercise and perform all the powers and duties of a board of county supervisors for that county.

This construction renders the case of *Smith v. Sherry*, 50 Wis., 210; *S. C.*, 54 Wis., 114, so strenuously relied upon by counsel, inapplicable to the case before us. On the first appeal in that case it was found that the lands taxed were not in Shawano, and it was assumed that they were in Seneca. On the second appeal it was found that they were not in Seneca. It was there said that "thus the question litigated upon the first trial was not whether the town of Seneca had jurisdiction to levy and collect the tax from the lands, but whether the village of Shawano had such jurisdiction. The question litigated upon the second trial was not whether the village of Shawano had jurisdiction to levy and collect the tax from the lands, but whether the town of Seneca had such jurisdiction." 54 Wis., 119. Here there is no question but

what the lands were properly assessed in the town of Jenny
by the officers thereof; and, under the construction given to
the statutes, there can be no question but what the taxes
were properly apportioned and levied by the county super-
visors of the county in which Jenny was situated, and that
the sale was made and the deeds issued by the county officers
of the same county, and hence the question of jurisdiction
there discussed does not arise.

Thus it appears that unless the organization was void for
the objections hereinafter stated, the county of Lincoln
became fully organized in October, 1874, with the requisite
county officers and a county board of supervisors, having
power to apportion and levy the taxes upon the assessments
made in the spring of 1874, at least upon such property as
was included in what was originally the town of Jenny.
Ch. 128, Laws of 1874, clearly contemplated that the new
county board thus constituted should proceed and levy
the taxes upon such prior assessments, at least so far as the
property in that town was concerned.   That would cover the
taxes for the year 1874.   Of course, in the spring of 1875
town officers were properly elected for the town of Jenny as
enlarged by virtue of the statute, in consequence of the
organization of the new county, and hence ample provisions
were made for the assessment, apportionment, and levy of
the taxes for the year 1875.   This being so, and the new
county having the requisite county officers to enforce collec-
tion, make sales, and issue deeds, it follows that the demur-
rers to the first and second causes of action herein were
properly sustained, unless the tax deeds therein mentioned
were void by reason of objections which we now proceed to
consider.

It is true that in every county, embracing more than one
town, the county board consists, under the statutes cited, of
the chairmen of the several towns, etc., while in every county
consisting of only one town, the supervisors of such town

constitute the county board. Is this in violation of that clause of the constitution which declares that "the legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable?" Sec. 23, art. IV. In *State v. Riordan*, 24 Wis., 484, this court, in an opinion by the present chief justice, construing that section, said: "Of course, absolute uniformity may be impracticable in all cases; the situation of the different counties and the convenience of the inhabitants may require some departure from the principle of rigid uniformity. This departure from absolute uniformity may be found in the general statute, which provides that the county boards, in each of the organized counties, shall consist of three members, whether the county has two assembly districts or less than that number. The important duties which the board of supervisors has to perform may require that there should be at least three members in every organized county, without regard to its population. So, when there is an even number of assembly districts in a county, it may greatly facilitate the transaction of business which comes before the board to have an additional member chosen from the county at large. The general statutes so provide, and the departure from uniformity seems to be necessary. These are proper matters of legislative discretion."

The language thus quoted is supported by subsequent decisions. *State v. Abert*, 32 Wis., 404. It is peculiarly applicable to the organization of a new county like the one in question. There may not be any necessity for more than one town, and yet there may be necessity for a county. But a county necessitates a board of supervisors, and if it contains but one town, then there can be but one chairman in such town, and it would hardly be claimed that one person could constitute such board, and hence there is no infringement of the rule of unity or the rule of uniformity to make the town board in such case also the county board. It sup-

plies a necessity, and is as nearly uniform as practicable, and preserves the unity of the system in that it constitutes the county board from town supervisors.

It is claimed by counsel who appear *amici curiæ*, that the act under which the organization was effected is void; because it did not provide for the election of a district attorney. Neither did it provide for the election of a sheriff or clerk of the circuit court, for the very obvious reason that the act expressly provided that the territory therein designated should, when organized, " constitute a separate county, except that the same shall be and remain attached to the county of Marathon for all judicial purposes under the laws of this state." Being still a part of Marathon county for all judicial purposes, the sheriff, district attorney, and clerk of the court for Marathon were also such officers for the territory included in Lincoln county as a part of Marathon county for that purpose. We apprehend there is no constitutional objection to the two counties remaining united for judicial purposes, notwithstanding the organization of the new county for other purposes. Such acts have often been passed, and we are not aware that they have ever been questioned.

The objection that the organic act did not provide for a county seat, does not seem to be well taken, since the general statute authorized the county board to fix and designate the county seat at its first regular meeting after the organization of the county. Sec. 1, ch. 89, Laws of 1872 (sec. 654, R. S.). For the reasons given we think the demurrers to the first and second causes of action alleged were properly sustained.

By ch. 241, Laws of 1876, entitled " An act to attach Lincoln county to the eighth congressional district, and to organize and define the boundaries of certain towns therein," approved March 10, 1876, the county of Lincoln was declared to be attached to and form a part of that congressional dis-

trict, and the whole territory of the county was thereby divided into three parts, to constitute and be known as the towns of Corning, Pine River, and Jenny, respectively, and the qualified electors in each were thereby required to meet at the respective times and places therein designated, and elect the various town officers as prescribed by law, and that after such several elections, and the officers elected thereat should qualify, the several towns named were to be deemed duly organized, and to possess all the rights and privileges of other towns in the state. It is urged that this chapter is in violation of the provisions of sec. 31 of the amendments to article IV of the constitution, which reads: "The legislature is prohibited from enacting any special or private laws: . . . (9) For *incorporating* any town or village, or to amend the *charter* thereof."

Does the act in question incorporate any town or amend the charter thereof? The word "charter," as here used, clearly refers to some special act of incorporation, and as no such chartered body existed in Lincoln county at the time, it is quite evident that the act in question cannot be regarded as an amendment to such a charter. The question for consideration, therefore, is whether the act in question was an act "for incorporating any town." The word "town" was defined by Mr. Justice Orton in *C. & N. W. Railway Co. v. Oconto*, 50 Wis., 189. The act does not, however, in express terms undertake to confer corporate powers. It simply declares that each of the three portions of territory described "shall constitute and be known as the town of" Corning, Pine River, and Jenny, respectively; and that after said several towns are duly organized as therein specified, they shall respectively "possess all the rights and privileges of other towns of this state." The general statute had previously provided that each organized town should be a body corporate, with certain specified powers. Sec. 1, ch. 15, R. S. 1858 (sec. 773, R. S.). The act merely

provided a particular method whereby certain territory described could be organized into towns under the names designated. Such organization brought each of those towns within the general statute, by virtue of which they acquired whatever corporate power they respectively possessed.

It is true that by the general statutes any county board of supervisors were specially empowered to set off, organize, vacate, and change the boundaries of towns in their respective counties, designate and give names thereto, and fix the time and place of holding the first election therein, subject, of course, to the limitation therein expressed. 1 Tay. Stats., 298, ch. 13, sec. 36, subd. 1; R. S., sec. 670, subd. 1; *Supervisors of La Pointe v. O'Malley*, 47 Wis., 332; *Town of Butternut v. O'Malley*, 50 Wis., 333. It is urged that the statutory power thus conferred was intended to be exclusive, and in that connection there may be some plausibility in claiming that the setting off, organizing, vacating, and changing the boundaries of a town by special act, is doing indirectly what the constitutional clause in question was intended to prohibit. This cannot be under the clause of the constitution in question, however, unless the special act complained of is one for incorporating a town or village. Undoubtedly towns have certain powers which are corporate in their character, but on the contrary they seem to be without some of the usual powers belonging to corporations, and hence, in the language of Chief Justice WHITON, "they are called *quasi*-corporations or corporations *sub modo* only." *Norton v. Peck*, 3 Wis., 721. That case was referred to approvingly in *Eaton v. Manitowoc*, 44 Wis., 493, by Mr. Justice ORTON, who added: "Towns are often called in common parlance, and sometimes unguardedly in statutes, municipal corporations, in connection with counties, cities, and villages; but when so called it is in the sense of mere corporations, or *quasi*-corporations, or of corporations *sub modo* only, and not in the sense of municipalities proper." In *C. & N. W.*

*Railway Co. v. Oconto, supra,* the same justice quotes approvingly from the supreme court of Illinois and the court of appeals in New York the following: "Townships are incorporated, not as cities and villages are, for their own benefit and by their assent, but like counties, as mere civil divisions of the state. . . . The several towns of this state are corporations for certain very limited purposes. . . . The several towns are political divisions organized for the convenient exercise of portions of the political powers of the state."

Mr. Cooley, considering municipal organizations, says: "Some of them are so feebly endowed with corporate life, and so much hampered, controlled, and directed in the exercise of the functions which are conferred upon them, that they are sometimes spoken of as nondescript in character, and as occupying a position somewhere between that of a corporation and a mere voluntary association of citizens. Counties, townships, school districts, and road districts do not *usually* possess corporate powers under special charters, but they exist under general laws of the state, which apportion the territory of the state into political divisions for convenience of government, and require of the people residing within those divisions the performance of certain public duties as a part of the machinery of the state, and, in order that they may be able to perform these duties, vest them with certain corporate powers. Usually their functions are wholly of a public nature, etc. . . . They are, therefore, sometimes called *quasi*-corporations, to distinguish them from the corporations in general, which possess more completely the functions of an artificial entity." Cooley on Con. Lim., 240, 241, and cases there cited. Mr. Dillon makes the same distinction, and says: "Corporations intended to assist in the conduct of local civil government are sometimes styled political, sometimes public, sometimes civil, and sometimes municipal; and certain kinds of them, with

very restricted powers,— *quasi*-corporations — all these by way of distinction from private corporations. . . . The phrase 'municipal corporations,' in the contemplation of this treatise, has reference to *incorporated* villages, towns, and cities, with power of local administration, as distinguished from other public corporations, such as counties and *quasi*-corporations." 1 Dillon on Mun. Corp., sec. 22.

These distinctions between municipal corporations, existing under and deriving their power from special legislative grants, and a mere township or town existing as a mere civil institution or delegation of certain very limited political power known as a *quasi*-corporation, are in harmony with our own views of the meaning of those terms, and are supported by the reasoning of Mr. Justice TAYLOR in *Smith v. Sherry*, 50 Wis., 213–216. Applying these distinctions to the constitutional clause in question, and we are clearly of the opinion that the prohibition is against the enactment of any special or private law for *incorporating* any town or village by special charter, or for the amendment of such charter. It is true that towns were not usually so incorporated before that amendment, but nevertheless the legislature, prior to that prohibition, had power to so incorporate, and hence the word "town," as well as "village," seems to have been introduced into the provision *ex industriâ*, to prevent the legislature from evading the prohibition by incorporating towns by special charter having substantially the same powers as what had been ordinarily understood by the word "village." We do not think it has any reference to what have been defined as mere *quasi*-corporations, like towns which do not exist by virtue of nor derive their powers from the enactment of any special or private law for incorporating the same.

Nor do we think that the manner of dividing the territory of the county up into three towns, in the manner indicated, was in violation of the constitutional prohibition against the establishment of more than one system of town and county

government. For reasons in support of this position see opinion in *C. & N. W. Railway Co. v. Langlade Co., post*, p. 614.

Nor do we think ch. 241, Laws of 1876, was a private or local law within the meaning of sec. 18, art. IV, of the constitution, which provides that "no private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." *Phillips v. Albany*, 28 Wis., 340; *Zitske v. Goldberg*, 38 Wis., 233, and cases there cited. It is true, the act operated in a single county, but it affected the rights of all the people therein; besides, it was of public concern, and can in no sense be deemed a private or local law, within the meaning of that section.

Whether the provision in sec. 4, ch. 241, Laws of 1876, to the effect that the county board should not have power to change the boundaries of the towns therein designated for three years, is valid or invalid, seems to be unnecessary here to consider; for, assuming it to be invalid, yet it is not so connected with the other provisions of the act as to invalidate them. *State v. Tuttle*, 53 Wis., 45. This being so, it raises no question to be considered upon this appeal.

For the reasons given, we are of the opinion that the demurrer to the third cause of action alleged was properly sustained.

*By the Court.*— The order of the circuit court is affirmed.